UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DONALD BROWN,

        Plaintiff,

v.

                                        Case No. 06-11736

DETROIT EDISON, a Michigan corporation,      Honorable Julian Abele Cook, Jr.

        Defendant.


## ORDER

On April 10, 2006, the Plaintiff, Donald Brown, commenced this lawsuit, in which he accused his employer, Detroit Edison, a Michigan corporation, of discriminating against him because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.  On April 8, 2008, Brown filed an amended complaint wherein he contended that his employer had also retaliated against him for having engaged in a legally protected activity contrary to the provisions of the Michigan Elliott Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 et seq.

On July 30, 2008, Detroit Edison filed a motion for summary judgment, arguing that there are no genuine issues of a material fact in dispute which, in turn, warrant the rendition of a judgment in its favor as a matter of law.[1]

_____

[1]Brown's initial response to Detroit Edison's motion for summary judgment (submitted on August 20, 2008) was subsequently struck from the record by the Court because it had been filed in violation of the twenty page limitation of E.D. Mich. LR 7.1(c)(3)(A).  Detroit Edison's

I.

Brown, a sixty-three year old man, began his employment with Detroit Edison in December 1974.  During his tenure at Detroit Edison, he worked in a variety of capacities (e.g.,  groundsman on a line crew,  truck driver, cable mechanic, and now as a member of the cable rigging group). In December 2000, Brown - then at the age of fifty-six and while working as a truck driver at the Detroit Edison's Shelby Service Center - applied for, and was accepted in, the cable splicer apprenticeship program.[2]

Brown maintains that he "was subjected to many age related comments  [throughout his time in this cable splicer apprenticeship program] and many persons openly expressed to him and others that [he] was too old to become journeyman and that they would try to prevent him from obtaining that status." He submits that two of his classmates, Melia Burrell and Willie Moore, as well as a journeyman, Ed Stull,  heard some of these critical comments by fellow-journeymen, trainers, as well as JASEC member Jim Wallace, all of whom spoke negatively about Brown's age. Pointing to his perceived extremely unpleasant working environment, Brown submits that he complained to Mulrenin who never conducted any investigation into the situation.

_____

corresponding reply (filed on September 4, 2008) was also stricken by the Court for having exceeded the seven page limitation set forth in E.D. Mich. LR 7.1(c)(3)(B).  Brown's request to submit a sur-reply brief was rejected by the Court on January 9, 2009.

[2]The cable splicer apprenticeship program is a four year program which is designed to train apprentices to become journeyman cable splicers. It is run by the Joint Apprentice Splice Evaluation Committee ("JASEC"), which is composed of an equal number of union and management representatives, with the JASEC Chair alternating between a union and management representative on a yearly basis.  In 2005 the JASEC Chair was Robert Mulrenin. This training program consists of classroom instruction and on-the-job training. The apprentices are evaluated for the quality of their work by (1) trainers in the classroom and (2) journeymen in the field.

2

Brown and his apprentice classmates were scheduled to complete their cable splicer apprenticeship program in December 2004. However, the JASEC introduced a new proficiency examination in October 2004, which was purportedly designed to test the knowledge that the apprentices had acquired during the course of the apprenticeship program. According to Detroit Edison, this proficiency examination was instituted in response to an incident in August 2004 when a recent graduate of the apprenticeship program failed to properly conduct a test to determine if a cable had been de-energized. As a result of this mishap, the apprentice with whom he was working spliced an energized cable, which in turn caused an electrical flash that resulted in serious burns to both of these workers.

Brown challenges this explanation, contending that the Detroit Edison's recitation of the unfortunate accident is inaccurate, in that the injuries were not caused by the recent graduate's lack of proficiency. Rather, he submits that (1) the cable had been erroneously tagged as a de-energized line, and (2) this new journeyman did not conduct a thorough test to confirm that it was not energized. It is Brown's belief that this new proficiency examination was, in reality, a measure to assure that he did not successfully complete the apprenticeship program.[3] In addition, Brown claims that when the new proficiency examination was announced as a requirement to receiving a journeyman card, he and the other apprentices were told that they would be allowed to retake the test as often as necessary to pass it.

Brown passed the written part of the proficiency examination on his second attempt.

---

[3]To bolster his theory, Brown says that he was approached by a more senior journeyman, Mike Griffith, who told him that the proficiency examination had been designed with him in mind, "so that [he] wasn't going to make it through the program." (Brown Dep. 145:4-8, January 24, 2008.)

However, he failed the joint building skills portion of the examination. Detroit Edison contends that (1) although the union contract provides that each apprentice would be given only two opportunities to pass this joint building skills test, and (2) even though all of Brown's classmates successfully completed their examinations in two attempts or less, it afforded him five opportunities to achieve a passing grade. It is the position of Detroit Edison that it wanted Brown to succeed because of its financial investment in putting him through the four year apprenticeship program.

Brown vehemently disagrees with Detroit Edison's presentation of the facts surrounding his five failed attempts to pass the joint building skills test. According to Brown, a fellow co-worker overheard a supervisor, Neil Place, say that he would intentionally slow him down in order to ensure he did not finish the test in a timely manner. Furthermore, it is his contention that the apprentice who had been assigned to assist him on his joint-building examination, was threatened with a low grade if he corrected any mistake that should have been brought to Brown's attention before the commencement of the examination. After the first failed effort, Brown was administered an examination that was different from those that had been given to his classmates. Brown also complains that (1) there were times during the joint-building exercise when he had no helper; and (2) he correctly handled the assigned tasks during the joint-building exercise but ran out of time because of his obligation to complete certain paperwork that on the first exam had been completed by his fellow-apprentice.

On March 29, 2005 the JASEC voted unanimously to remove Brown from the apprenticeship program. As such, he was the only apprentice who was removed from the program and failed to receive a journeyman's card. Following his removal, Brown was placed in the cable

4

rigging group under the supervision of Emmitt Hilson.

Convinced that Detroit Edison had purposely laid out an employment path for him that was destined to fail because of his age, Brown initiated this lawsuit in an effort to rescue his job advancement efforts. He firmly believes that Detroit Edison established a dual standard of work environment for him and the other workers at his job site. As an example, he asserts that co-workers and supervisors smoked in his presence, in violation of the Detroit Edison "no smoking" policy. Yet, and despite his complaints to supervisors about the negative effect that the presence of smoke had upon him, nothing was done to correct the situation.[4] Detroit Edison denies this allegation by insisting that it attempted to respond responsively to his complaints but was unable to do so because Brown refused to identify the people who were violating the no-smoking policy.

On April 20, 2007, Detroit Edison says that it became necessary to issue a written warning to Brown for an act of insubordination when he refused to comply with Hilson's instructions to remove himself from a manhole because of his use of a defective ladder. On August 27, 2007, Brown received an administrative sanction ("coaching") for having left his work station without permission. While acknowledging his receipt of this disciplinary action, he claims "all he did was stop to use a restroom which is allowed." Brown received a second coaching warning several months later for an incident on October 17, 2007 in which he was allegedly disrespectful to a security guard. He denies this characterization. Brown received a third "coaching" disciplinary

---

[4]In his second amended complaint, Brown also alleges that as a result of the smoking violations by his fellow workers, he was forced to seek and obtain medical attention for the respiratory problems which had been caused by this environmental problem. Nevertheless, he submits that Detroit Edison, while ignoring its own work rule policies, reprimanded him for having taken time away from his job. Brown believes that this administrative reprimand was legally wrong, in that he is protected by the Family and Medical Leave Act.

notice on April 11, 2008 when, according to Detroit Edison, he acknowledged telling a co-worker that he "had his head so far up the supervisor's behind that he could see no light." Brown dismisses this accusation as "shop talk" which is typical of the way co-workers banter with each other.

## II.

A party is entitled to a summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Courts are obliged to review all of the evidence before them and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

Furthermore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute must also be "genuine," in that it must pertain to evidence upon which a jury could return a verdict in favor of the non-moving party. *Tysinger*, 463 F.3d at 572. However, a court is not to weigh the evidence or attempt to assess issues relating to credibility, although it may inquire as to the plausibility of inferences from circumstantial evidence. *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 2004).

Once the moving party has met its burden of demonstrating that there is no genuine issue as to a material fact, the non-moving party cannot merely rest upon the allegations in its pleadings. *See* Fed. R. Civ. P. 56(e). The non-moving party must "go beyond the pleadings and by . . .

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

III.

In support of its motion for a summary judgment, Detroit Edison contends, in essence, that Brown has not provided any direct evidence of age discrimination. Furthermore, it asserts that any discriminatory comments, at best, were made by non-JASEC journeymen and can only be construed as stray remarks. Detroit Edison also contends that Brown cannot establish a prima facie case of discriminatory conduct because he (1) was not qualified for the position that had been sought by him, (2) has failed to identify a younger, similarly situated apprentice who received more favorably treatment, and (3) cannot demonstrate that its non-discriminatory reason for his removal from the apprenticeship program was merely a pretext for the claimed act of discrimination. .

According to the ADEA, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a)(1). An employee, who sues on the basis of an alleged ADEA violation, may make a claim by means of direct or circumstantial evidence of impermissible age discrimination. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)). Direct evidence of discrimination is

7

"evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)). Although circumstantial evidence does not, on its face, prove impermissible discriminatory animus, it does allow a "fact finder to draw a reasonable inference that discrimination occurred." *Id.*

In those situations in which an employee's claim is based upon circumstantial evidence, courts are encouraged to adopt the *McDonnell Douglas* burden-shifting framework to analyze the evidence. *Id.* The first step is for the employee to demonstrate that he was (1) a member of a protected class at the time of the challenged wrongful action by the employer, (2) subjected to an adverse employment action, (3) qualified for the position, and (4) replaced with a younger employee or treated differently from a similarly situated employee outside of the protected class. *Martin*, 548 F.3d at 410. The burden of establishing a prima facie case of discrimination is not an onerous one. *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008).

If the aggrieved employee establishes a prima facie case of discrimination, the employer must "articulate a legitimate, nondiscriminatory reason for its employment action." *Martin*, 548 F.3d at 410. (citing *Kline,* 128 F.3d at 342). If the employer meets this burden, then the employee must proffer evidence so that a trier of fact could "reasonably reject the employer's explanation." *Id.* (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1073 (6th Cir. 1994)).

In his brief in opposition to Detroit Edison's motion, Brown impliedly acknowledges that he has not provided the Court with any direct evidence of discrimination on the basis of his age. However, he believes that the evidence - mostly in the form of deposition testimony - is sufficient

8

to support his allegations of age discrimination.

Both parties agree that Brown has satisfied the first two elements of a prima facie case under *McDonnell Douglas*.  However, their agreement ends when each party conducts its own analysis of the third *McDonnell Douglas* criterion.  On this point, Detroit Edison contends that Brown was not qualified for the apprenticeship program because he failed to pass the proficiency exam after five efforts.  However, Detroit Edison's allegation fails because the Court may not consider this proffered nondiscriminatory reason for removing Brown from the apprenticeship program in its analysis of the prima facie case.  *See Wexler*, 317 F.3d at 574 (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000)) (consideration of employer's nondiscriminatory reason at prima facie stage would "bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.")

Detroit Edison also submits that Brown failed to identify a similarly situated person who received superior work-related treatment because of age. On this point,  Detroit Edison contends that Brown has been unable to identify any apprentice who, despite having failed the proficiency examination on five occasions, was given a journeyman's card or permitted to take the test for a sixth time.

In order to satisfy the similarly-situated element under *McDonnell Douglas*, a plaintiff - such as Brown - must show that he was similarly situated to a younger employee in all *relevant* aspects. *Martin*, 548 F.3d at 412 (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)) (emphasis in original).  Here, Brown has proffered evidence in the form of his deposition, as well as those from his classmates and some journeymen.  As noted

earlier, one of his classmates stated during a deposition that Brown was subjected to ridicule and complaints from co-workers because of his age and his slow pace, even though there were younger apprentices with allegedly similar "work difficulties." who did not receive the same treatment.[5]

Brown also provided testimony that he was repeatedly interrupted while taking the "hands on" portion of the proficiency examination.[6]   He also points to the deposition of Burrell who testified that, while taking the same portion of the proficiency examination, an apprentice assisted her with some of the required paperwork.  Brown notes that (1) every other member of his class was younger than him and received their journeyman's card, and (2) he was the only apprentice who was removed from the program.  He also proclaims that some of the joint building tests that were administered to him after his first failed effort were different from the examination that his classmates passed.[7]  Thus, the evidence proffered by Brown, when viewed in a light most favorable to him, shows that there were other younger, similarly situated apprentices who were treated

---

[5]For instance, Burrell testified that one of the trainers, Rick Fisher, made comments about Brown's age, "such as he was slow, why was [Brown] starting a program so late in his life, he would never make it[,]" (Burrell Dep. 15:1-3, April 24, 2008) and that "[Brown] couldn't do it or that he needed to go and retire because of how old he was."  Burrell also testified that journeyman Steve Maxwell made comments, which she perceived to be related to his age, such as asking whether "[Brown] need[ed] to go take some more vitamins or something so that he could do his job."  (Burrell Dep. 24:14-16.) However, Burrell testified that other younger apprentices, including herself, were similarly slow but their slowness was attributed to inexperience.  (Burrell Dep. 18:18-22.)  Another one of Brown's classmates, Willie Moore, also provided testimony that he heard journeyman Dennis Smith say to Brown, "At your age you [are] too hold to be in an apprenticeship."  (Moore Dep. 15:18-19.)

[6]Burrell testified that journeyman Neil Place said "he could slow [Brown] down if he'd just keep going in there, meaning if he ke[pt] walking into his manhole, he could slow him down."  (Burrell Dep. 38:18-21.)

[7]As an example of how some of the tests were different from the one that his classmates passed, Brown testified that he was forced to go to the warehouse to get his tools and material before the test began, whereas the tools and material were laid out for his classmates.  (Brown Dep. 297:5-299:1, April 25, 2008.)

10

differently.  As such, Brown has established a prima facie case of age discrimination as defined by *McDonnell Douglas*.

Turning to Detroit Edison's nondiscriminatory counter-argument, it asserts that remarks by several journeymen about Brown's age are inconsequential because (1) none of these individuals are JASEC members and were not involved in the decision-making process to remove Brown from the apprenticeship program, (2) their comments are isolated stray remarks, and (3) none of the JASEC members relied upon the daily evaluations by the journeymen when they assessed Brown's tenure with the apprenticeship program.

However, when attempting to evaluate the merit, if any, of Detroit Edison's summary judgment motion, the Court must seek to determine if there exists a genuine issue over a material fact.  Turning to the deposition testimony by several Detroit Edison workers who allegedly made comments about the connection between Brown's slowness and his age,[8] the Court looks to the deposition testimony of journeyman Ed Stull, who maintains that he was told by JASEC member Jim Wallace that Brown was too slow, an evaluation that would be read by the other members of the JASEC.  Brown's fellow-class mate, Burrell also testified that she heard Tim Wallace joking with JASEC member Jim Wallace about giving Brown more time while he was building a joint because of his age.  Thus, Brown advances a "poisoned well" theory; namely, that the journeymen, who allegedly made the discriminatory statements about his age, reflected a collective bias in their negative evaluations of him and, in so doing, communicated these sentiments to the  members of

_____

[8]Brown proffered evidence showing that many of the low evaluations he received were from the same trainers and journeymen who had been overheard making discriminatory comments.

the JASEC, including Jim Wallace.[9]  Assuming the truth of Brown's allegation for the singular purpose of addressing this summary judgment motion, the Court - when considering the JASEC administrative decision to remove from the apprenticeship program  and  the depositions that have been proffered by Brown - concludes that there is a genuine question of a material fact for a finder to address and resolve on this issue.   As such, Detroit Edison's application for a summary judgment must be denied.

IV.

With respect to Brown's retaliation claim under the ELCRA, Detroit Edison contends that Brown cannot establish a prima facie case of retaliation, as defined by the *McDonnell Douglas* Court, because (1) he has not been subjected to an adverse employment action, (2) none of the decision-makers knew of his discrimination complaints, and (3) there is no competent evidence which establishes a causal connection between the protected activity and the alleged adverse employment action.  To support his claim, Brown advances that he has been subjected to (1) smoking by co-workers and supervisors in violation of an existing policy by Detroit Edison and his complaints to supervisory personnel which were left without resolution, and (2) unwarranted disciplinary action and threats of other forms of discipline.

In order to establish a prima facie case of retaliation under the ELCRA, an aggrieved plaintiff must show that (1) he engaged in a protected activity, (2) the defendant knew of the protected conduct, (3) the defendant subjected him to an adverse employment action, and (4) there

---

[9]JASEC member Richard Sweet testified that members of the JASEC members routinely examine evaluations.  In response to a question during a deposition, he acknowledged that "if there were . . . a group of journeyman who decided they didn't want an apprentice to get through, that they could basically poison the well for the JASEC by giving consistently low grades . . . ." (Sweet Dep. 33:13-20, February 21, 2008.)

was a causal connection between the protected activity and the adverse employment action. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (citations omitted)

Here, Detroit Edison concedes that Brown was engaged in a protected activity when he filed this lawsuit. However, it maintains that none of its decision-makers were aware of Brown's decision to turn his attention to a court for relief. The record indicates that Brown received (1) a written warning on April 20, 2007, and (2) coaching sanctions on August 27, 2007, October 17, 2007, and April 11, 2008. Detroit Edison provided the affidavit of Walter Tetteh, who asserts that he (1) "review[s] disciplinary actions and make[s] recommendations as to the level of discipline to impose" and (2) recommended that Brown should be given a written warning for insubordination, which was subsequently given on April 20, 2007. However, it appears that Brown's supervisor, Emmitt Hilson, was the management person who (1) accused Brown of being insubordinate and (2) was the decision-maker in all three of the coachings sanctions that Brown ultimately received. Hilson has also conceded in his deposition testimony that he was aware of Brown's discrimination charge and lawsuit. Thus, when viewing the evidence in the light that is most favorable to Brown, he has presented a sufficiency of evidence upon which a jury could rely in order to find that Detroit Edison, through those persons who are responsible for imposing work-related disciplinary measures, had knowledge of his protected activity.

Detroit Edison also submits that the three coaching sanctions and the one written discipline do not rise to the level of an adverse employment action. In addition, it maintains that coachings - as used administratively - are not (1) considered to be disciplinary actions under its collective bargaining agreement with the union, and (2) recorded on an employee's record. However, although these incidents - when viewed separately - arguably may not rise to the level of an adverse

13

employment action, these series of actions by the employer, whether formal discipline or not, could lead a reasonable person to fear for the security of his job. Indeed, Hilson testified that he could not recall any other employee who had received this amount of discipline within the space of one year. In addition, in the last coaching sanction, Brown was warned that "[a]ny further unsatisfactory conduct [would] result in formal discipline up to and including termination." Viewing the evidence in the light most favorable to Brown, a rational trier of fact could logically conclude that this series of coachings and written discipline were designed to end in Brown's termination, thus, constituting an adverse employment action.

It is also Detroit Edison's contention that Brown has failed to advance evidence which would establish a causal connection between his protected activity and the adverse employment action. "[A]lthough Michigan courts assess claims of retaliation under the ELCRA using the same framework as that used by federal courts, . . . the standard for causation is higher." *Mikey*, 516 F.3d at 523 n.2. Specifically, the plaintiff must show that "'his participation in activity protected by the [EL]CRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two.'" *Id.* (quoting *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001)). This causal connection may be established through circumstantial evidence "as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis." *Rymal v. Baergen*, 686 N.W.2d 241, 258 (Mich. Ct. App. 2004) (citations omitted).

Here, Brown has met this burden by proffering the deposition testimony of Hilson, who testified that (1) he could not recall any other employee who had received the amount of discipline that Brown received during the course of one year and (2) Brown was his only employee who had

14

ever filed a lawsuit, alleging unlawful discrimination in the work place. Thus, a fact-finder could reasonably infer from this testimony that the unusual amount of discipline he received was because he had filed the instant discrimination lawsuit.

Inasmuch as Brown has established a prima facie case of retaliation, Detroit Edison must now provide a nondiscriminatory reason for its adverse employment actions. *See Mickey*, 516 F.3d at 526. If the employer articulates this reason, then the complainant must establish that the employer's nondiscriminatory reason is a pretext and may do so by showing that it "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). The complainant must also establish that the employer's nondiscriminatory reason was not just a pretext, but was a "pretext for unlawful discrimination." *Rymal*, 686 N.W.2d at 258 n. 9.

Here, Detroit Edison has advanced that Brown (1) received a written warning for insubordination because of his refusal to obey Hilson's instruction to remove himself from a manhole and off of a defective ladder, (2) was coached for making an inappropriate comment to a co-worker, (3) received another coaching for being disrespectful to a security guard at the Connor's Creek facility, and (4) was coached for leaving a work site without permission.

However, in his response to these reasons, Brown denied that he was insubordinate to his supervisor, asserting that Hilson's version of the facts is completely inaccurate. With respect to his alleged inappropriate comment to a co-worker, Brown asserts that the co-worker, to whom the misdirected comment was directed, filed a charge against him only after receiving pressure from Hilson to do so. Regarding his alleged disrespect of a security guard, Brown says that Detroit Edison has greatly mischaracterized his interaction with a security guard at the Connor's Creek

substation. According to him, the incident stems from his interaction with the security guard over the use of a rest room facility during a lunch break.   Finally, Brown maintains that the coaching warning that he received for leaving a job site was unjustified. It is Brown's contention that the allegations by Detroit Edison (i.e., he "shut[] the job down without telling the work leader") were false because he had let his co-worker know that he was going to the restroom.

After assessing these charges and counter-charges under the appropriate standards of review for a summary judgment motion, the Court concludes that a reasonable jury could arguably determine that the series of disciplinary actions by Detroit Edison were forms of harassment in violation of (1) the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., and (2) the Michigan Elliott Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 et seq.

V.

Accordingly and for the reasons that have been stated above, the Court must, and does, deny Detroit Edison's motion for summary judgment.

IT IS SO ORDERED.

Dated: March 26, 2009                    s/Julian Abele Cook, Jr.
         Detroit, Michigan                    JULIAN ABELE COOK, JR.
                                                    United States District Court Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 26, 2009.

                                            s/ Kay Doaks
                                            Case Manager